## Walker v. Taylor.

## Jones v. Taylor et al.

(Decided October 1, 1929.)

690

A. T. W. MANNING and H. H. OWENS for appellant Walker.

H. C. GILLIS and J. J. TYE for appellant Jones.

TYE, SILER, GILLIS & SILER for appellee.

OPINION OF THE COURT BY COMMISSIONER HOBSON—
Affirming.

B. P. Walker, S. H. Jones, and Ike Taylor were candidates for the Republican nomination for sheriff of Knox county at the August primary, 1929. On the face of the returns Walker received 2,517 votes; Jones, 2,333; Taylor, 1,862. Jones and Taylor filed contests. The court recounted the ballots, and on the recount Walker received 2,441, Jones received 2,276, and Taylor 1,857. Jones and Taylor in his notice of contest each charged Walker with violating the Corrupt Practice Act. Walker by his answer and counter contest charged Jones and Taylor with violating the Corrupt Practice Act and denied that he had violated it. Jones did not charge Taylor with violating the Corrupt Practice Act. A large amount of proof was taken, and on final hearing the circuit court held that Walker and Jones had both violated the Corrupt Practice Act and could not receive the nomination. He held that Taylor had not violated the Corrupt Practice Act, and adjudged him the nomination. From this judgment Walker and Jones appeal. The cases were consolidated in the circuit court and have been heard together in this court.

The first question made by Walker is that the notices of contest were not properly served and that his motion

to quash the return and dismiss the cases should have been sustained. The return of the officer as to the execution of the notice on Walker shows these facts: He received the papers about 5 p. m., August 10, and went immediately to the courthouse in Barbourville in search of Walker; then through all the offices in the courthouse; then to his residence; then to the residence of Sallie Hoskins, a relative; then to Walker & Jones' store, in which Walker was interested; then to the residence of Hester W. King, his niece; then to the residence and place of business of Amin Simons, his brother-in-law; then to the residence of W. O. Mealers, another brother-in-law; then to the Dixie Inn; then to Lewis Filling Station; then to his home a second time about 7 p. m. At all these places he made inquiries, but no person knew of his whereabouts. His wife told the officer on his second trip to his residence that he would be home about 9 p. m. that day. He then went to the office of H. H. Owens, Walker's attorney; then to Blackstone Hotel; then made inquiries of taxi drivers; then to his home again about 9 p. m.; then to R. C. Partin's residence; then looked in all the business houses around the square; then about 10:40 he returned to his house, and, not finding Walker, he delivered a copy of the notice to his wife, a person over the age of 16 years, also tacked a copy of the notice on the door of his residence, as he could not find him in person in Knox county. The proof shows that Walker was a deputy sheriff. He kept the books in the sheriff's office and was ordinarily in the sheriff's office or about the courthouse. Partin was a man who had taken much interest in his race. Walker filed his affidavit that he was not hiding out, but he does not disclose in his affidavit where he was. He filed the affidavit of a number of persons who testify to seeing him in the town that day, and some of them state after 5 o'clock. But this evidence in no wise conflicts with the return of the sheriff which shows that he made a reasonable effort to locate him, and, being unable to find him, delivered the notice to his wife at his residence. The court on these facts properly overruled the motion to quash the notice. See Howard v. Cockrell (Ky.) 20 S. W. (2d) 230 Ky. 581, decided September 24, 1929, also Landrum v. Cockrell (Ky.) 20 S. W. (2d) 230 Ky. 599, decided September 27, 1929.

The next question presented is, did Walker violate the Corrupt Practice Act? The evidence shows, without contradiction, that he had published and himself distrib-

uted throughout the county, during the campaign, the following circular:

### "What is Pure Religion"

" 'Pure religion and undefiled before God and the Father is this: To visit the fatherless and widows in their affliction, and to keep himself unspotted from the world.'

"To show you my heart is right I make you this promise: That no widow's cow or other property will be sold for taxes, and where their taxes does not exceed $20.00 no widow will have any taxes to pay during my term of office if elected.

"Now, to men and women, if you want to help the widows and orphans, cast your vote for B. P. Walker for Sheriff, and elect him, and he will pay the taxes for the widows and orphans where they do not exceed $20.00 for any widow who does not have a living husband.

"Widows and Orphans, you have a chance of your life, go to talking and asking your friends to help you help a man that is coming as your friend and elect him so he can help you.

"Your friend,
"B. P. Walker."

He followed it up by making speeches that he would be as good as his bond and none of the widows whose taxes were under $20 would have to pay taxes if he was elected. His pre-election expense account showed an expenditure of $360. His original postelection expense account showed an expenditure of $447.40. Section 3 of the act is in these words:

"It shall be unlawful for any person who is a candidate for nomination or election for any state, county, city, town, municipal or district office to expend, pay, promise, loan or become pecuniarily liable in any way for money, or other thing of value, either directly or indirectly, or to agree or enter into any contract with any corporation, association or person to vote for or support any particular thing or measure in consideration of the vote or support, moral or financial, of any such corporation, association, or person, and it shall be unlawful for any corporation, association or person to demand that any candidate for office shall promise or agree

in advance or shall make any contract, oral or written, to support any particular individual, thing or measure, in consideration for the vote or the support, financial or moral, of such corporation or person, in any election, primary or nominating convention, but no expenditure made by any candidate, or others for him, for the purpose of employing and paying clerks and stenographers, or for printing and advertising, or in securing suitable halls for public speaking, or suitable headquarters, stationery and stamps, or actual traveling expenses, shall be deemed illegal." Section 1565b3, Ky. Stats.

It will be observed that by the statute it is unlawful for any person who is a candidate for nomination for any county office, except for the purposes therein specified, to promise or become liable in any way for money or other thing of value, either directly or indirectly, or make any agreement, in consideration of the vote or the support, financial or moral, of any person in the election. Appellant in his amended post election expense account stated that the tax of these widows would not amount to more than $100 a year. But this would be $400 in the four-year term, and, when added to his other admitted expenditures, would make the amount more than $1,000, the maximum allowed. On the other hand, the tax commissioner of the county took the assessor's book and made a list of these widows and figured up that the amount would be over $2,000 a year. If we split the difference between these estimates, we have $1,000 a year promised in consideration of the candidate's election. Such a promise, if credited, would bring to his support not only the widows, but all their friends and sympathizers.

Walker relies on Owsley v. Hill, 210 Ky. 285, 275 S. W. 797, 799, as sustaining him, but that opinion rests upon the facts of that case, which are thus stated by the court: "At the time the contestee made his announcement, which is complained of in this action, the salary of the county attorney for the term to which he was an aspirant had not been fixed. It is obvious from a reading of the record that, at the time the salary of the county attorney was fixed for the term now ending, it had been raised by $400 over the salary prevailing prior thereto. The announcement of the contestee and the subsequent newspaper interview when read in the light of these facts, which were commonly known to the voters of his county, plainly

mean that the contestee was running on a platform of fixing the salary, when the time came for it to be fixed, at the old rate rather than the new rate."

That is not this case. The taxes of the widows are fixed by law, and, if such a promise as this is held not within the statute, its operation for securing fair elections would be practically defeated. In Carrothers v. Russell, 53 Iowa, 346, 5 N. W. 499, 502, 36 Am. Rep. 222, the court, holding that a like offer was within the statute, said: "It is true, an offer to pay money into the public treasury is not in one sense an offer to pay money to an elector, the money in the treasury being public and not individual property. But nearly all electors are taxpayers, and an offer to pay money into the public treasury, with the intent by such offer to influence the electors to elect to office the person making such offer, has all the effect of the offer of a bribe. It has also all the objectionableness of the offer of a bribe, and must be deemed to be such within the meaning of the statute, unless it is saved from that character in view of the demands of the public interest."

In State v. Bunnell, 131 Wis. 198, 110 N. W. 177, 182, 11 Ann. Cas 564, the candidate for county judge made this offer: "I will draw all papers necessary in the settlement of estates and give the necessary advice, free of charge." The court said: "Such promise was clearly within the condemnation of the statute." To same affect, see State v. Purdy, 36 Wis. 213, 17 Am. Rep. 485; State v. Elting, 29 Kan. 397; State ex rel. Church v. Dustin, 5 Or. 375, 20 Am. Rep. 746; notes L. R. A. 1917B, 196, and cases cited.

The circuit court therefore properly held that Walker had forfeited all right to the nomination. Jones insists that the circuit court erred in holding the same thing as to him. On questions like this, the court on appeal gives some weight to the finding of the circuit judge, who is on the ground and knows local conditions and the local way of doing things. The proof shows that some days before the election Jones and two other candidates had a meeting at which they agreed upon men to work for them at the different precincts. It also shows that after this a considerable sum of money was sent out in $1 bills to different precincts in the county to be used at the election, and that some of this money was used in buying votes for Jones. While Jones did not send out

this money himself, he was in one room and the man who sent out the money was in the next room with the door opened between while much of the business was going on. Jones sent some men to the man, and the circumstances clearly indicate that a man of ordinary prudence would have known what was going on. The court therefore cannot disturb the finding of the circuit court as to Jones. Lastly, it is insisted that the same rule should have been applied to Taylor, and that the circuit court erred in holding otherwise. But Taylor had no money or very little. The proof is not clear that he sent out any money. Some of his relatives did use a little money but they say that they only put it out to be used in hauling voters to the polls, etc. The proof on the question is so unsatisfactory that, if the finding of the circuit judge is given some effect, it cannot be disturbed here.

Jones insists that the allegations of Walker's answer are insufficient to show a violation by him of the Corrupt Practice Act, but, if the facts stated therein are true, clearly the provisions of the act were violated. He also insists that he got more votes than Taylor, and that Taylor filed no contest against him. But he and Walker each destroyed the other. The statute applies: "It is hereby provided that the candidate who has received the next highest number of votes and who has not violated the provisions of this act shall be declared nominated." Ky. Stats. 1565b11.

The statute confers the nomination on the candidate who is a party to the contest and did not violate the act, when all those who received more votes than he did violate it. Charles v. Flanary, 192 Ky. 511, 233 S. W. 904; Tackett v. Mayo, 211 Ky. 30, 276 S. W. 974; Owsley v. Vaughn, 213 Ky. 817, 281 S. W. 1002.

While one not receiving a majority of the votes cast may not, under the Constitution, be declared elected to the office, McKinney v. Barker, 180 Ky. 526, 203 S. W. 303, L. R. A. 1918E, 581, the Legislature may so provide as to nominations. Mellon v. Goble, 210 Ky. 711, 276 S. W. 830.

Judgment affirmed.

The whole court sitting.