**E. T. SPARKS et al., Appellants,**

**v.**

**Dr. Eli BOGGS et al., Appellees.**

Court of Appeals of Kentucky.

March 25, 1960.

Rehearing Denied Nov. 23, 1960.

S. M. Ward, Hazard, for appellants.

W. E. Faulkner, D. G. Boleyn, Hazard, for appellees.

STEWART, Judge.

This is an appeal from a judgment of the Perry Circuit Court holding, albeit reluctantly on the part of the trial judge, that appellees in their race for the offices of city commissioner did not violate the Corrupt Practices Act (KRS Chapter 123) by promising certain things hereinafter specified.

Hazard, located in Perry County, is a third-class city operated under the city manager form of government. The three appellants, E. T. Sparks, Finis Marable, and George Feltner, and the four appellees, Dr. Eli Boggs, Fred Combs, R. W. Gibson and Curt Feltner, were all candidates at the regular November 3, 1959, election for the above offices. Four could be elected and the four appellees were the winners.

Appellants and one Robert Ken Terry, who was also an unsuccessful candidate for the office of city commissioner, filed on November 16, 1959, a petition in the Perry Circuit Court alleging that appellees had violated the Corrupt Practices Act and asking that the election of each of appellees be declared void and that they be adjudged as not entitled to qualify for or hold the offices to which they were elected. Terry afterwards withdrew from this action.

Appellees had formed themselves into a slate, denominating it "The Good Government Ticket." They had handbills printed and distributed, titled "Honest Platform," whereby they made seven pledges to the electorate. "Promise No. 2" is the one which is the basis of this litigation, and by its terms they agreed (and we quote the exact statement they publicized for the consumption of the voters):

> "To serve for the minimum salary of $1.00 per year and to vote for the total savings of $2,000.00 per year to be distributed as follows:
>
> "(a) $500.00 per year, religious education program.
>
> "(b) $500.00 per year, retarded children program.
>
> "(c) $500.00 per year, for the purpose of beautifying the approaches to the City of Hazard.
>
> "(d) $500.00 per year, for Little League baseball program.
>
> (These programs are available to all citizens of Hazard, regardless of race, creed or color.)"

Under KRS 89.480(2), in respect to a third-class city, " * * * each commissioner shall receive an annual salary of not more that $500." However, subsection (3) of that statute provides that the board of commissioners may reduce the annual salary of such an officer "to an amount of not less than one dollar." It is admitted the yearly salary of a city commissioner of Hazard was at the time fixed at $500.

Appellants argue that appellees held themselves out as undertaking, if elected city commissioners, to render their services in such a capacity gratuitously. To back up this assertion, they call attention to the fact that, since they had promised to expend for the purposes enumerated in their "Promise No. 2" the total sum of $2,000 each year, it is clear their intention was not to receive even the one dollar their salary possibly could have been set at under KRS 89.480(3). They contend that such an offer made to the voters by appellees, namely, to work without salary, has been held to be against the public policy of this state and within the purview of the statutes enacted to prevent corrupt practices in elections.

■ The question of whether a successful candidate has violated the Corrupt Practices Act cannot be determined in a suit brought by taxpayers and electors, Dietz v. Zimmer, 231 Ky. 546, 21 S.W.2d 999, but can be decided only in an election contest brought by a defeated candidate. See KRS 122.010; Judd v. Polk, 267 Ky. 408, 102 S.W.2d 325, and Young v. Jefferson County Election Commission, 304 Ky. 81, 200 S.W.2d 111.

■ The present petition was filed by three of the four defeated candidates. In it, however, they do not claim the offices at stake for themselves, but ask only that the election of appellees be declared void and that the latter be adjudged unqualified to hold office because of their alleged violation of the Corrupt Practices Act. In Greene v. Cawood, 230 Ky. 823, 20 S.W.2d 984, this Court ruled in effect that an election contest was in the nature of an inquiry

into the purity of an election. However, in the case of Kluemper v. Zimmer, 240 Ky. 225, 41 S.W.2d 1111, hereinafter discussed in some detail, it was established that, although not claiming to have been elected himself, a defeated candidate may contest the election of his opponent on the ground that he has violated the Corrupt Practices Act.

■ Appellees maintain the petition is defective because appellants did not aver that the conduct complained of influenced any voters to cast their ballots for any of appellees or that the election was in any way tainted by their action in circulating the promise in controversy. However, in construing KRS 122.010 (then Ky.Stat., Sec. 1565b–11) this Court stated in Bingham v. Smith, 210 Ky. 256, 275 S.W. 811–812: "Under this section the election of the successful candidate may be declared void for a violation of the provisions of the act, and it is not necessary to allege that the result of the election was affected by such violation." In Dyche v. Scoville, 270 Ky. 196, 109 S.W.2d 581, 584, it was said on this point: "We are not unmindful of the fact that we have held, in effect, that the bribery of one vote by a candidate, * * * constitutes such a violation of the Corrupt Practices Act as might deprive the candidate of his nomination, if such bribery was satisfactorily shown."

It appearing, therefore, that this is a "contest", brought by the proper parties and that the petition sufficiently sets forth a good cause of action, we may now consider the alleged violation of the Corrupt Practices Act. Although no specific section of that Act is relied upon, an examination of KRS Chapter 123 indicates KRS 123.040 is the provision purported to have been violated. It reads:

"No candidate for nomination or election to any state, county, city or district office shall expend, pay, promise, loan or become pecuniarily liable in any way for money or other thing of value, either directly or indirectly, to any person in consideration of the vote or financial or moral support of that person. No such candidate shall promise, agree or make a contract with any person to vote for or support any particular individual, thing or measure, in consideration for the vote or the financial or moral support of that person in any election, primary or nominating convention, and no person shall demand that any candidate make such a promise, agreement or contract."

The trial court, in its opinion, held that this lawsuit must follow and be governed by the law laid down in Owsley v. Hill, 210 Ky. 285, 275 S.W. 797, although as already noted the trial judge disagreed with the ruling in that case. There Hill, running for county attorney of Lincoln County, announced he proposed to have the fiscal court reduce the salary of that office by $400, so as to restore it to its old salary basis, and then have the court allot that sum to the county road fund. The fiscal court had not fixed the salary, as provided by Ky.Stat. § 1072, the applicable statute, for the term of office to which that candidate aspired.

This Court concluded in that case the promise of Hill did not violate the Corrupt Practices Act, as it appeared the salary of the office for which he was a candidate had not been set in the manner required by law. Hence, he had not pledged himself to perform the duties of the office in question, if elected, for less than the legal compensation he was entitled to draw, because the amount of his annual pay had never been determined. That case further held Ky. Stat., sec. 1565b3 (now KRS 123.040) does not refer to a promise made by a candidate to the entire people, which the opinion there stated was the type of promise Hill had advanced to induce support in his behalf.

The material difference between the case of Owsley v. Hill and the one at bar is that the annual salary of a commissioner for

Hazard had already been fixed by law for the new term, whereas such had not been done in respect to the county attorney's office in controversy in Owsley v. Hill. The latter case did not involve a pledge to serve at reduced pay, for the reason already shown, but clearly the commissioners elected in Hazard agreed to perform their official duties for practically nothing and thereby went on record as releasing almost all claim to their legal compensation. It follows that the rule of law applicable to the facts set forth in Owsley v. Hill has no application to the facts before us.

Appellants rely for reversal of the judgment on Kluemper v. Zimmer (Bailey v. Pieper), 240 Ky. 225, 41 S.W.2d 1111, 1117, wherein the election of the city commissioners of a second class city, that is, Covington, was invalidated by their announced purpose, if successful in their race, to elect a city manager and pay him out of their official salaries. When these candidates were making their race Covington had not adopted, and could not operate under, the city manager form of government. This Court voided the election of the city commissioners in that case, saying: "The promise in the present instance was not only to spend money for a purpose not authorized by law, but it also involved the discharge of official duties for less than the salary fixed therefor."

The public announcement of appellees, circulated in connection with their campaign, constituted, if we accept their construction of it, an agreement to perform their duties as city commissioners at a reduction in salary. As their rate of pay had already been legally fixed at $500 per year, the amount of salary they were entitled to receive upon taking office could not be altered. Section 161 of the Constitution of Kentucky plainly prohibited such contemplated action upon their part. The pertinent language of that section reads: "The compensation of any city, county, town, or municipal officer shall not be changed after his election or appointment, or during his term of office; * * *." The word "changed" implies that the compensation of an official may not be scaled up or scaled down. See also Section 235 of the Constitution of Kentucky. In view of the quoted constitutional inhibition, appellees gave out to the electorate a pledge they could not abide by and therefore were guilty of misleading the people of Hazard.

We believe the case of Kluemper v. Zimmer, cited above, controls the determination of this action. There, as we interpret that case, the campaign agreement of the city commissioners, if elected, to appoint a city manager (which they could not legally do) and to donate all their salaries to compensate him (which would result in their serving gratis) was condemned for two reasons: First, because it was unlawful for a candidate to promise to abdicate, if elected, the duties and responsibilities of the office for which he was a successful candidate; and, next, because it was against public policy to offer to discharge the obligations of an elective public office for less than the salary fixed by law. It is the last-mentioned holding that has a direct bearing upon the case at bar.

Kluemper v. Zimmer cites with approval and includes in its opinion this language from State ex rel. Bill v. Elting, 29 Kan. 397. The latter case, after reciting certain rules from the Corrupt Practices Act of the state of Kansas, which are similar to the provisions of our Act under consideration here, said:

"As a consequence of these rules it has been held, that a candidate for an office to which is attached a fixed salary, who offers to the electors to discharge, if elected, the duties of such office at less than the stated salary, is not entitled to have counted for him any votes given in consideration of such promise. * * *

"The theory of popular government is that the most worthy should hold the offices. Personal fitness—and in that is included moral character, intellectual ability, social standing, habits

of life, and political convictions—is the single test which the law will recognize. That which throws other considerations into the scale, and to that extent tends to weaken the power to personal fitness, should not be tolerated. It tends to turn away the thought of the voter from the one question which should be paramount in his mind when he deposits his ballot. It is in spirit at least, bribery, more insidious, and therefore more dangerous, than the grosser form of directly offering money to the voter."

The general rule on the question before us is thus stated in 43 Am.Jur., Public Officers, sec. 374, p. 159: "An agreement by a candidate for office that if chosen he will discharge the duties of the office without compensation or for a lesser compensation than that provided by law, or will pay part of his salary into the public treasury, is illegal, whether made in good faith or not. The underlying principle of the decisions (on this point) is that when a candidate offers to discharge the duties of an elective office for less than the salary fixed by law, a salary which must be paid by taxation, he offers to reduce pro tanto the amount of taxes each individual taxpayer must pay, and thus makes an offer to the voter of pecuniary gain."

It appears to us there can be no escape from the conclusion that a promise to take a reduction in the salary set by law for an elective public office, or an agreement to discharge the duties of the office gratis, advanced by one to induce votes for his candidacy, is so vicious in its tendency as to constitute a violation of the Corrupt Practices Act. To hold otherwise would permit the various elective public offices to become filled by those who would purchase their election thereto by making the most extravagant bid. The auction method of choosing a public officer would supplant the personal fitness test. Eventually most of the public offices would be occupied by the opulent, who could afford to serve without pay, or by the ambitious, who would serve only for the pittance of honor attached to the office, or by the designing grafter, who would surely obtain his remuneration by methods which would not bear scrutiny. Under such a system good government would certainly vanish from every subdivision of the state.

Wherefore, the judgment is reversed with directions that it be set aside and a new one entered declaring the election of appellees null and void.