## Hurst v. Petroleum Exploration, Inc.

(Decided November 15, 1927.)

Appeal from Breathitt Circuit Court.

Mines and Minerals.—Under oil and gas lease providing a certain semiannual rental during such time as there was no producing well or lessee was not engaged in drilling or had not for a six months' period been engaged in drilling, held, that a gas well drilled on premises was a "productive" well within the lease, precluding the necessity of general rental payments, although the gas was not being taken and marketed, where lessor was being paid the same flat rate as he would have received if gas were marketed.

W. L. KASH for appellant.

EDWARD O'REAR and ALLEN PREWITT for appellee.

OPINION OF THE COURT BY COMMISSIONER HOBSON—Affirming.

On April 29, 1922, S. H. Hurst, leased to the Petroleum Exploration, a corporation, 2,000 acres of land for oil and gas. The lease contained the following provisions:

"To have and to hold unto and for the use of the lessee for the term of 5 years from the date hereof and as much longer as oil, gas, or gasoline is produced, yielding to the lessor the one-eighth part of all the oil produced and saved from the premises, delivered free of expense to the lessor's credit into

tanks of pipe lines and, before such delivery, un-affected by any subsequent division or partition of the premises.

"Should gasoline be manufactured from casing-head gas produced from oil wells on the premises hereby leased, the lessor shall receive in full payment for such gas, one-eighth of the surplus gasoline thus manufactured and saved, delivered in tanks provided by the lessee on the premises, free of expense, or one-eighth of the proceeds, less the cost of marketing the same, payable to the lessor semi-annually. The gasoline manufactured from casing-head gas produced on the premises hereby leased may be apportioned among several farms, according to the number of wells on each producing and supplying gas to the gasoline plant or plants.

"Should a well be found producing gas only, then the lessor shall be paid for the gas produced from each such well at the rate of $200 for each year so long as the gas is used or sold therefrom, payable quarterly while so marketed or used.

"Lessee agrees to commence well on said premises within one month from the date of release of all leases in said premises hereof and pay the lessor $500 each six months in advance from the 29th day of October, 1922, until said well is commenced, or this lease surrendered. The drilling of a nonprodutive well shall be accepted by the lessor in lieu of delay rental for a period of six months from the date of its completion, at the expiration of which time the lessee shall commence another well or resume the payment of delay rental.

"The above rents and royalties are reserved on account of all of the oil and gas and include all outstanding interests, rents, and royalties, and, in the event that the lessor owns but an undivided interest, they shall be apportioned accordingly."

On May 19, 1925, Hurst brought this suit against the corporation, alleging that the defendant entered upon the land and commenced the drilling of a well and continued so to drill until it completed two or more nonproductive wells; that the last well was completed before April 29, 1923, and since that date no further drilling had been done and no delay rentals had been paid. He prayed judgment for $500 a year for the two years that

had so passed, amounting to $1,000. The company answered controverting the allegations of the petition. The case was heard before a jury, and at the conclusion of the evidence the court peremptorily instructed the jury to find for the defendant. Hurst appeals. The uncontroverted facts shown by the proof are these:

Immediately after the lease was made, the defendant went to work drilling. The first well was commenced in May, 1922, and was completed on July 8, 1922, at a cost of $4,997.30. This well produced from 2 to 5 barrels of oil a day. The defendant then went to work and drilled a second well, which was commenced on August 18, 1922, and was completed on October 4 at a cost of $4,301.32. This well produced 2 barrels of oil per day. The defendant constructed a 250 barrel oil tank and pumped the oil into the tank, but there was no way to deliver the oil, and the pumping operations soon stopped. It commenced drilling a third well on February 22, 1923, and completed it on March 26, 1923, at a cost of $4,727.86. This was a gas well. It produced 450,000 cubic feet of gas every 24 hours. There was no pipe line to deliver the gas and so this well was closed in so as to prevent the gas from escaping, but after this the defendant paid Hurst $200 a year on this gas well, as provided by the contract.

Hurst claims that the wells were not productive, because none of the oil or gas produced from the wells was sold. But, if the gas had been sold, he would only have been entitled to the $200 a year, and this he got; so he cannot complain that the gas was not sold. The fact was this was a new field, and the company was simply waiting to get pipe lines in to deliver the product. Such a delay must reasonably have been anticipated by the parties when the contract was made. For the gas plainly could not be delivered until a pipe line was built to the well. It cannot be said that a gas well which produces 450,000 cubic feet of gas a day is a nonproductive well, and certainly Hurst cannot maintain that it is a nonproductive well when it is paying him $200 a year.

Though the two oil wells might be considered nonproductive under the rule laid down in Kies v. Williams, 190 Ky. 596, 228 S. W. 40, and Enfield v. Woods, 198 Ky. 328, 248 S. W. 842, this cannot apply to the gas well; for the ruling in those cases rests on the ground that a productive well is one that yields a royalty to the landowner because otherwise he gets no royalty, and the well is

therefore nonproductive to him. But Hurst got $200 a year for the gas well. He got no part of the gas or its proceeds if sold. He was not affected by the fact that the gas was not piped away.

Judgment affirmed.